**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**CASE NO.**

**DEANNA C JUMP, INCORPORATED,** a
Florida corporation,

     Plaintiff,                        **Demand for Jury Trial**

vs.

**HOPE KING**, an individual, and
**HOPE KING TEACHING RESOURCES, INC.** a
South Carolina corporation

     Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiff, DEANNA C JUMP, INCORPORATED ("Plaintiff" or "DCJ"), by and through

its undersigned attorneys, hereby sues Defendants, HOPE KING, an individual ("King"), and

HOPE KING TEACHING RESOURCES, INC., a South Carolina corporation

("HKTR")(collectively "Defendants"), and alleges as follows:

**JURISDICTION & VENUE**

     1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the

amount in controversy is greater than $75,000 and the parties are citizens of different states.

     2.     This Court has supplemental jurisdiction over Plaintiff's related claims arising

under state law pursuant to 28 U.S.C. §1367(a).

3.     Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims occurred in this district and Defendants regularly conduct business in this district.

## PARTIES

4.     Plaintiff is a corporation organized and domiciled in the State of Florida.

5.     Defendant, King, is a citizen of the State of Georgia who regularly conducts business in the State of Florida and is subject to the jurisdiction of this Court.

6.     Defendant HKTR, is a corporation organized under the laws of the State of South Carolina with its principal place of business located in Atlanta, Georgia. HKTR regularly conducts business in the State of Florida and is subject to the jurisdiction of this Court.

7.     Defendants, and each of them, were at all relevant times herein mentioned, the agents, servants, employees, and/or joint venturers of the other Defendant, and at all times herein mentioned were acting within the course and scope of said agency, employment, or joint venture.

8.     All conditions precedent to maintaining this action have been performed, are deemed excused, satisfied, or otherwise waived.

## FACTUAL BACKGROUND

9.     Deanna C. Jump ("Jump") is an award-winning kindergarten teacher, author, and speaker who has been featured on CNN, MSNBC, CBS This Morning, and The Steve Harvey Show.

10.     Jump has been presenting at professional development conferences for educators since 2008.

11.    DCJ is a Florida corporation that has offered teaching resources and training since on or about July 2013.

12.    On or about October 10, 2014, DCJ held its first conference, which at the time was entitled "Ready, Set, Teach," at the Florida Mall and Conference Center in Orlando, Florida.

13.    In July 2015, Jump attended the Staff Development for Educators Conference ("SDE"), where she spoke with Defendant King.

14.    While at SDE, Jump asked King if she would be interested in joining her at future DCJ conferences.

15.    During and after SDE, Jump and King remained in contact and discussed details and plans for the upcoming DCJ conference, including the date, location, website and social media development.

16.    On or about March 6, 2016, DCJ hosted its second conference, rebranded as "Get Your Teach On" (hereinafter, "GYTO"), at the Florida Mall and Conference Center in Orlando, Florida.

17.    DCJ was responsible for the primary aspects of GYTO, including, without limitation, invoicing, billing, marketing, merchandise and retail sales, ticket sales, presenter contracts, and venue contracts.

18.    GYTO quickly became one of the premier educational events and conferences for elementary and middle school educators and administrators, offering both national and regional conferences at various locations throughout the United States.

19.    King participated in the 2016 GYTO Conference.

20.    King's company, HKTR, was paid by DCJ for King's participation in the 2016 GYTO Conference.

21.     HKTR received an IRS Form 1099, as required, for DCJ's payment for King's participation.

22.     Based on the success of the 2016 GYTO conference, four (4) additional GYTO Conferences were planned for 2017.

23.     DCJ was primarily responsible for planning the 2017 GYTO Conferences and solely responsible for entering all contracts in connection therewith, including, without limitation, presenter and venue contracts.

24.     By all accounts, the 2017 GYTO Conferences were very successful.

25.     At all 2016 and 2017 GYTO Conferences, Jump was responsible for organizing and presenting kindergarten and first grade ("K-1") content and activities, while King was responsible for organizing and presenting second through fifth grade ("2-5") content and activities.

26.     HKTR was paid by DCJ for King's services as a presenter at each of the 2017 GYTO Conferences.

27.     DCJ again provided HKTR with an IRS Form 1099 for the payment for King's services.

28.     DCJ filed an application for trademark registration with the United States Patent and Trademark Office (the "USPTO") for "Get Your Teach On" (the "GYTO Mark") on or about March 1, 2017.

29.     On or about November 14, 2017, the GYTO Mark was registered with the USPTO and assigned Reg. No. 5337175.

30.     By June 2017, the relationship between Jump and King became strained because King had different ideas about how the GYTO Conferences should operate.

31.     On or about June 30, 2017, King emailed Jump and stated that she wanted to "start the conversation of how to split the brand."

32.     King proposed that DCJ be solely responsible for GYTO's K-1 revenue and expenses, while King would be solely responsible for GYTO's 2-5 revenue and expenses.

33.     In an effort to keep the peace and not disrupt the success of GYTO Conferences, Jump agreed, on behalf of DCJ, to assign fifty percent (50%) of the rights in and to the GYTO Mark to King, individually.

34.     The Trademark Assignment (the "Assignment") purporting to transfer fifty percent (50%) of the rights in and to the GYTO Mark to King is attached hereto as Exhibit A.

35.     King thereafter caused the Assignment to be filed with the USPTO.

36.     Without DCJ's or Jump's knowledge or consent, King changed DCJ's address of record with the USPTO in connection with Reg. No. 5337175 to King's address.

37.     Jump also agreed, on behalf of DCJ, that King could have greater control over the second through fifth grade portion of the GYTO Conferences (the "2017 Agreement").

38.     Also pursuant to the 2017 Agreement, DCJ would be responsible for all K-1 GYTO activities and expenses, and directly collect revenue in association therewith, and King would be responsible for all 2-5 GYTO activities (which would later expand to grades two through eight) and expenses, and directly collect revenue in association therewith.

39.     Jump made multiple attempts to formalize the 2017 Agreement, all of which King rejected.

40.     At no point did Jump cede all control of the GYTO Conferences to King or anyone else.

41.     Also pursuant to the 2017 Agreement, DCJ and King agreed to share ancillary GYTO expenses and revenues (by way of example, merchandise revenues).

42.     HKTR began exercising the rights granted to King pursuant to the Assignment and 2017 Agreement without any written licensing agreement in connection therewith.

43.     Upon information and belief, King has not individually exercised any of the rights granted pursuant to the Assignment or 2017 Agreement.

44.     HKTR caused a new GYTO website (the "Website") to be created to market all GYTO Conferences, not merely 2-8.

45.     Neither King nor HKTR shared the login information to the Website or the GYTO Instagram account with Jump or DCJ.

46.     The Website contained, and still contains, a link for K-1, which redirects the user to a GYTO page controlled by DCJ.

47.     Without Jump's consent, King, individually and on behalf of HKTR, began using the Website and GYTO social media accounts to promote HKTR events and products, such as Better Together (a web series) and The Wild Card and The Wild Card for Kids (books by King and Wade King).

48.     HKTR entered into contracts for GYTO Conferences, including both K-1 and 2-5, without DCJ's input, approval, or consent.

49.     On countless occasions, Jump questioned King about the terms of the contracts and insisted that DCJ be included in GYTO Conference decision-making.

50.     King, individually and on behalf of HKTR, entered into contracts for GYTO Conferences without first giving DCJ the opportunity to review or agree to the terms and financial obligations.

51.      King, individually and on behalf of HKTR, continued to exclude Jump and DCJ from critical elements of GYTO Conferences and, by virtue of HKTR's skyrocketing budget for conferences, made increasing payment demands from DCJ in connection therewith.

52.      King and HKTR provided summarized invoices containing partial lists of revenues, costs, and expenses.

53.      In 2019, DCJ was presented with a spreadsheet containing DCJ's purported share the 2018 GYTO National Conference for $152,451.18 ("2019 Spreadsheet"), a true and correct copy of the summary page of which is attached hereto as Exhibit "B".

54.      Upon receipt of the invoice, Jump informed King that in the future DCJ would not pay or be responsible for any expenses which were not pre-approved by DCJ in writing.

55.      Jump had every reason to believe that King clearly understood and would comply.

56.      Nevertheless,  King and HKTR entered into multiple contracts with venues and vendors and spent hundreds of thousands of dollars on purchases and services for three subsequent 2019 GYTO Conferences without seeking or obtaining DCJ's approval as agreed.

57.      On or about February 27, 2020, HKTR delivered an invoice (the "2020 Invoice"), a true and correct copy of which is attached hereto as Exhibit "C", to DCJ and demanded payment for the unapproved expenses incurred by HKTR in connection with the 2019 GYTO Conferences and general expenses incurred between July 2019 and February 2020.

58.      The total amount of the 2020 Invoice was $89,903.00.

59.      HKTR claimed that the 2020 Invoice represented DCJ's portion of shared expenses.

60.      DCJ requested an itemized list of expenses in connection with the 2020 Invoice.

61.      King was angered by DCJ's refusal to immediately pay the 2020 Invoice and request for documentation of the expenses.

62.     HKTR retaliated by announcing a GYTO virtual conference for 2-8 only (the "2-8 GYTO Virtual Conference") in a live video on social media.

63.     Jump and DCJ learned of the 2-8 GYTO Virtual Conference via the live video.

64.     Immediately, teachers who attended prior GYTO Conferences and were watching the live video began posting questions in the live video comment section, asking why K-1 was being left out and why there would be no content available for those teachers.

65.     Jump, who was blindsided by the announcement, posted a comment on the live video in response to the questions about K-1 and explained that she was just then learning about the 2-8 GYTO Virtual Conference and promised there would be a virtual event for K-1 teachers.

66.     DCJ subsequently announced the virtual K-1 GYTO Virtual Conference and, because teachers were experiencing unprecedented struggles due to the COVID-19 pandemic, that it would be a free event.

67.     This announcement further enraged King.

68.     Many GYTO 2-8 conference attendees were displeased that HKTR and King were charging for tickets to the 2-8 GYTO Virtual Conference while the K-1 GYTO Virtual Conference was being offered for free and voiced their opinion on social media.

69.     King then posted a video on Instagram wherein she damaged the GYTO brand by alleging that everyone who complained about 2-8 GYTO Conference prices and refund policies was a liar and falsely alleged that those commenters had not purchased tickets to GYTO events.

70.     King, individually and on behalf of HKTR, launched multiple additional events under the GYTO brand, along with new lines of GYTO merchandise, thereby using the GYTO Mark in commerce without DCJ's involvement (the "DCJ Excluded Uses").

71.     HKTR did not account to DCJ for any of the DCJ Excluded Uses of the GYTO Mark despite DCJ's ownership interest in and to the GYTO Mark, and instead retained one hundred percent of the profits derived therefrom.

72.     Some of the DCJ Excluded Uses were haphazardly and quickly thrown together without any due diligence.

73.     One such DCJ Excluded Use, GYTO Next Level, resulted in King and her husband, Wade King, receiving a cease and desist letter which alleged intellectual property infringement and deceptive trade practices.

74.     Neither King nor HKTR informed Jump that they had received a letter alleging infringement and deceptive trade practices in connection with the GYTO brand.

75.     Despite King and HKTR's unilateral action and retention of profits in connection with the DCJ Excluded Uses, in or around June 2020, King began asserting that DCJ could not use the GYTO Mark without the involvement of King or HKTR.

76.     King, individually and on behalf of HKTR, has intentionally and falsely listed King's husband, Wade King, as a co-founder of GYTO.

77.     Upon information and belief, King, individually and on behalf of HKTR, misrepresented the ownership interests in and to GYTO Conference sponsors by stating that all of GYTO, with the exception of K-1 but including the GYTO Mark, was owned by King and Wade King.

78.     Neither Wade King nor HKTR has, or has ever had, any ownership interest in the GYTO Mark.

79.     After several months of requests, HKTR provided DCJ with partially itemized lists of expenses incurred in connection with the Fall 2019 and Spring 2020 GYTO Regional Conferences.

80.     The itemized lists revealed that HKTR was deducting 40% of the total revenue from GYTO merchandise sales to offset "HKTR Income Tax" before allocating DCJ's share of the merchandise revenue.

81.     Upon information and belief, HKTR used the "HKTR Income Tax" offset to intentionally, illicitly, and impermissibly divert revenues to HKTR and deprive DCJ of its share of merchandise revenue in connection with past GYTO Conferences.

82.     In addition, one of the expenses which HKTR demanded DCJ pay a share was travel to and from conferences (including air travel, rental car, and airport parking charges) for an HKTR employee.

83.     No DCJ employee travel expenses are paid for, nor have they ever been paid for, in whole or in part, by King or HKTR.  Neither DCJ nor Jump have ever included such travel expenses as a GYTO Conference expense.

84.     Another expense which HKTR demanded payment for from DCJ was for hotel rooms for HKTR's 2-8 Conference volunteers.

85.     No hotel expenses attributable to volunteers utilized by DCJ in connection with the GYTO Conferences have ever been included as a GYTO expense.  Moreover, no such expense has ever been paid for, in whole or in part, by King or HKTR.

86.     HKTR also fraudulently passed on expenses for hotel charges for presenters hired by HKTR for the 2-8 portion of GYTO Conferences even though the parties agreed that HKTR

was solely responsible for the 2-8 GYTO Conference expenses and HKTR made no allocation of revenues associated with the 2-8 portion of GYTO Conferences to DCJ.

87.     Upon review of the 2020 Invoice, DCJ also discovered that the total amount alleged to be due to HKTR exceeded the sum of the expenses by $9,000.00, thereby causing DCJ's alleged share of expenses to be falsely inflated by $9,000.00, creating a potential windfall for HKTR.

88.     Further, the itemized list of expenses in connection with the 2020 Invoice revealed that HKTR incurred multiple high-dollar expenses which were not approved in advance by DCJ, even though HKTR insisted upon being reimbursed by DCJ.

## COUNT I: DECLARATORY RELIEF

### In connection with the GYTO Mark
### As to Defendant King

89.     Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

90.     This action is brought pursuant to Rule 57 of the *Federal Rules of Civil Procedure,* for a declaration that DCJ has the right to use the GYTO Mark in commerce, without restriction.

91.     Plaintiff began using the GYTO Mark in commerce in 2016, thereby acquiring common law rights in and to the GYTO Mark.

92.     Plaintiff filed an application with the United States Patent and Trademark Office (USPTO) for the GYTO Mark in 2017.

93.     The USPTO issued Reg. No. 5337175 for the GYTO with Plaintiff as the sole owner thereof.

94.     DCJ entered into the Assignment, which purportedly transferred a share of the GYTO Mark to King.

95.     King has asserted that Plaintiff has no right to use the GYTO Mark absent King's approval thereof, giving rise to an immediate and present controversy of a justiciable nature.

96.     There is a present need for declaratory and injunctive relief because Plaintiff and King disagree with the other's position regarding the rights to the GYTO Mark, and the parties are entitled to have a resolution of this issue declared and established.

97.     Furthermore, there is a bona fide, actual, present and practical need for a declaration which will resolve the present state of facts and controversy.

WHEREFORE, Plaintiff respectfully requests that this Court:

   a.   Declare that Plaintiff is the rightful owner of the GYTO Mark;

   b.   Declare that Plaintiff has the unrestricted right to use the GYTO Mark in commerce;

   c.   Enter judgment in Plaintiff's favor against Defendant King;

   d.   Award Plaintiff compensatory damages;

   e.   Award Plaintiff its interest, costs and attorneys' fees; and

   f.   Such other and further relief this Court deems just and proper.

## COUNT II: DECLARATORY AND INJUNCTIVE RELIEF

**In connection with the Trademark Assignment
As to Defendant King**

98.     Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

99.     This action is brought pursuant to Rule 57 of the *Federal Rules of Civil Procedure,* for a declaration that the Assignment is void for lack of consideration.

100.    Defendant caused an attorney to draft the Assignment, which purports to transfer fifty percent of the rights in and to the GYTO Mark from Plaintiff to Defendant King.

101.    Plaintiff did not have the benefit of counsel prior to signing the Assignment.

102.    Plaintiff received no consideration, whether monetary or otherwise, in exchange for the rights purportedly granted to Defendant King.

103.    There is a present need for declaratory and injunctive relief because Plaintiff and King disagree with the other's position regarding the rights to the GYTO Mark, and the parties are entitled to have a resolution of this issue declared and established.

104.    Furthermore, there is a bona fide, actual, present, and practical need for a declaration which will resolve the present state of facts and controversy.

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Declare that Plaintiff is the rightful owner of an undivided one hundred percent of the rights in and to the GYTO Mark;

b.    Declare that Plaintiff has the unrestricted right to use the GYTO Mark in commerce;

c.    Enter judgment in Plaintiff's favor against Defendant King;

d.    Award Plaintiff compensatory damages;

e.    Temporarily and permanently enjoin Defendant from further use of the GYTO Mark;

f.    Award Plaintiff its interest, costs and attorneys' fees; and

g.    Such other and further relief this Court deems just and proper.

## COUNT III: FRAUD

### As to both Defendants

105.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

106.    King, individually and on behalf of HKTR, knowingly and purposefully made false statements of material fact to the Plaintiff regarding the revenues collected and expenses incurred in connection with the GYTO Mark.

107.    Plaintiff reasonably and justifiably relied on those false statements made by King, individually and on behalf of HKTR, in connection with the amounts payable by DCJ.

108.    King's false statements, individually and on behalf of HKTR, induced Plaintiff to pay large sums of money to HKTR which were not, in fact, owed to HKTR.

109.    Plaintiff would not have agreed to pay those amounts had Plaintiff known that the amounts were not actually owed and due to HKTR.

110.    As a direct and proximate result of King's fraudulent conduct, individually and on behalf of HKTR, Plaintiff has suffered, and continues to suffer, monetary harm, including attorneys' fees and costs, for which it is entitled to damages.

WHEREFORE, Plaintiff demands judgment in its favor for damages, costs and attorneys' fees against Defendants and such other and further relief that this Court deems just and proper.


## COUNT IV: DECEPTIVE AND UNFAIR TRADE PRACTICES
### Fla. Stat. § 501.204
### As to both Defendants

111.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

112.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"), prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

113.    Defendants are engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

114.    King, individually and on behalf of HKTR, engaged in deceptive and unfair trade practices by knowingly and purposefully making and perpetuating false statements of material fact about its ownership interest in and to the GYTO Conferences.

115.    King, individually and on behalf of HKTR, deceived the consuming public by fragmenting the brand into multiple GYTO spin-off conferences, including a conference that resulted in a cease and desist letter for potential infringement from another entity.

116.    Defendants deceptive conduct led consumers to believe that DCJ was, in whole or in part, a source of these spin-off conferences.

117.    Defendants' fraudulent conduct constitutes unfair or deceptive acts or practices in violation of § 501.204.

118.    Defendants' unconscionable and deceptive acts and practices were designed to inflict injury and harm to DCJ and gain an unfair business advantage, as well as to cause damage to consumers in the State of Florida.

119.    In addition, Defendants have been unjustly enriched because of their deceptive acts or practices.

120.    As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff has suffered, and continues to suffer, harm, including attorneys' fees and costs, for which it is entitled to damages.

121.    Pursuant to Fla. Stat. § 501.211, Plaintiff is entitled to entry of an injunction enjoining Defendants from any further violations of the statute.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants for damages, interest, costs and attorneys' fees, entry of an order enjoining Defendants from further violating the statute and any such other and further relief that this Court deems just and proper.

## COUNT V: BREACH OF CONTRACT

### As to both Defendants

122.     Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

123.     In 2017, the parties entered into a valid and enforceable oral agreement, the 2017 Agreement, wherein they agreed to share ancillary GYTO Conference expenses and revenues based on their pro rata share of GYTO Conference revenue.

124.     At all times material hereto, the oral agreement was in full force and effect.

125.     King, individually and on behalf of HKTR, breached the 2017 Agreement by:

a.    Collecting ancillary revenues derived from GYTO Conferences in 2019 and 2020 without accurate allocations to Plaintiff as agreed;

b.    Knowingly making impermissible deductions in the amount of 40% of gross revenue for income tax liabilities to reduce Plaintiff's share of the ancillary revenue;

c.    Knowingly making inappropriate and impermissible deductions from the ancillary revenues for expenses that were the sole responsibility of Defendants, including, but not limited to, the costs of hotel rooms and parking for 2-8 presenters and volunteers; and

d.    Failing to provide prompt, detailed, and accurate accounting of all ancillary revenue and expenses.

126.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered, and continues to suffer, harm, including monetary damages for lost revenue and overpaid expenses.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants for damages, interest, costs and attorneys' fees, and such other and further relief that this Court deems just and proper.

## COUNT VI: UNJUST ENRICHMENT

### As to both Defendants

127.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

128.    Plaintiff conferred a benefit on Defendants by sharing in the ancillary expenses of the GYTO Conferences.

129.    At all times material hereto, Defendants knew of the benefit conferred by Plaintiff because they accepted the payments for the ancillary expenses multiple times.

130.    Defendants accepted and retained the benefit conferred by Plaintiff when they accepted and kept all expense payments made by Plaintiff.

131.    It would be inequitable for Defendants to retain the expense payments made by Plaintiff without paying any of the ancillary revenue due and owing to DCJ.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants for damages, interest, costs and attorneys' fees, and such other and further relief that this Court deems just and proper.

## COUNT VII: BREACH OF IMPLIED COVENANT

## OF GOOD FAITH AND FAIR DEALING

### As to both Defendants

132.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

133.    Every contract, by operation of law, including the 2017 Agreement, contains an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in trade.

134.    The implied covenant also prohibits either party from engaging in any conduct or in doing anything that deprives the other party of the fruits of the agreement or the benefit of the bargain.

135.    The implied covenant requires Defendants to act reasonably and fairly under the terms of the 2017 Agreement and, among other things, to refrain from conduct that would cause Plaintiff substantial harm.

136.    Defendants had a contractual obligation to act fairly and in good faith when accounting for the ancillary revenues and expenses for the GYTO Conferences.

137.    Defendants failed to fulfill their obligations to act fairly and in good faith when they improperly reduced Plaintiff's pro rata share with personal expenses and expenses within the sole responsibility of HKTR.

138.    Defendants further failed to fulfill their obligations when they failed to pay Plaintiff its pro rata share of the ancillary revenues.

139.    Defendants have breached the implied covenant of good faith and fair dealing.

140.    As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered, and continues to suffer, harm, including monetary damages for lost revenue and overpaid expenses.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants for damages, interest, costs and attorneys' fees, and such other and further relief that this Court deems just and proper.

## COUNT VIII: QUANTUM MERUIT

### As to Defendant HKTR

141.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

142.    DCJ and HKTR agreed that each would provide services in connection with the GYTO Conferences and that each would be compensated therefor, in part, by receiving their pro rata share of revenue generated by sales of GYTO Merchandise.

143.    A reasonable person would expect to pay for the services rendered by Plaintiff to HKTR.

144.    King, individually and on behalf of HKTR, collected revenues derived from GYTO Merchandise sales at the Conferences in 2018, 2019 and 2020.

145.    King, individually and on behalf of HKTR, knowingly made inappropriate and impermissible deductions from GYTO Merchandise revenues, including, without limitation, costs that were the sole responsibility of HKTR and improper income tax deductions equal to forty percent (40%) of the gross merchandise revenues.

146.    HKTR has yet to pay Plaintiff for the services rendered and has thereby been unjustly enriched.

147.    As a direct and proximate result, DCJ has suffered, and continues to suffer, harm, including monetary damages for lost revenue and overpaid expenses.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants for damages, interest, costs and attorneys' fees, and such other and further relief that this Court deems just and proper.

## COUNT IX: BREACH OF DUTY OF CARE

**Fla. Stat. 620.8404**
**As to both Defendants**

148.    Plaintiff re-alleges, re-avers and re-incorporates by reference all allegations contained in paragraphs 1 through 88 as though fully set forth herein.

149.    Plaintiff and Defendants formed a general partnership by virtue of their activities in connection with GYTO (the "GYTO Partnership").

150.    By virtue of their status as partners in a general partnership, Defendants owe a duty of care to the partnership and the other partners in the conduct of the partnership business.

151.    Defendants violated their duty of care by co-opting certain design elements and copyrighted works owned by King's former employer, Ron Clark Academy, in connection with GYTO marketing, resulting in GYTO being accused of copyright infringement and deceptive and unfair trade practices.

152.    Such conduct by Defendants was reckless and/or grossly negligent, and exposed both the GYTO Partnership and Plaintiff to liability.

153.    Plaintiff has suffered, and continues to suffer, financial and reputational harm, as well as harm to DCJ's goodwill, as a result of Defendants' breach of their duty of care.

WHEREFORE, Plaintiff demands judgment in its favor against Defendant HKTR for damages, interest, costs and attorneys' fees, and such other and further relief that this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure for all issues so triable.

Respectfully Submitted,

MEEHLE & JAY P.A.

By: /s/ Tania Williams
Tania Williams, Esq.
Florida Bar No.: 599425
1215 E. Concord Street
Orlando, Florida 32801
T: (407) 792-0790
F: (407) 792-4787
E: tania@meehle.com
Attorney for Plaintiff

By: /s/ Davey T. Jay
 Davey T. Jay, Esq.
Florida Bar No.: 0023255
1215 E. Concord Street
Orlando, Florida 32801
T: (407) 792-0790
F: (407) 792-4787
E: davey@meehle.com
 Attorney for Plaintiff

## VERIFICATION

I, Deanna C Jump, declare as follows:

1.      I am the President of the corporate Plaintiff in the present case, a permanent resident of the United

States of America, and a citizen of the State of Florida.

2.      I have personal knowledge of the corporation, corporate activities, and corporate intentions, including

those set out in the foregoing Complaint, and if called on to testify I would competently testify as to the

matters stated therein.

3.      I have personal knowledge of Defendants, Defendants' activities, and Defendants' intentions,

including those set out in the foregoing Complaint, and if called on to testify I would competently testify as to

the matters stated therein.

4.      I have read the foregoing, and the facts alleged therein are true and correct to the best of my

knowledge and belief.

5.      I verify under penalty of perjury under the laws of the United States of America that the factual

statements in this Complaint concerning the corporation, corporate activities, and corporate intentions are true

and correct, as are the factual statements concerning Defendants, Defendants' activities, and Defendants'

intentions. 28 U.S.C. § 1746.

Executed this _17_ day of August 2020.

By: _Deanna Jump_
Deanna C Jump

STATE OF _FLORIDA_   )
                                        )
COUNTY OF _ORANGE_   )

Sworn to and personally subscribed before me by means of ☑ physical presence or ☐ online notarization, by
Deanna C Jump ☐ who is personally known to me or ☐ who produced _FLORIDA  DRIVER LICENSE_
as identification, and in witness whereof, I have hereunto set my hand and seal this on this _17_ day of _AUGUST_
2020.

_Michael L. Donato_
Signature of Notary Public

MICHAEL L. DONATO
Notary Public - State of Florida
(SEAL)   Commission # GG 260272
My Comm. Expires Sep 30, 2020

Name: _MICHAEL  L.  DONATO_
My Commission Expires: _9·30·2020_